[No. 3793.]

THE BOARD OF COUNTY COMMISSIONERS OF MINERAL COUNTY ET AL. v. THE BOARD OF COUNTY COMMISSIONERS OF HINSDALE COUNTY.

1. STATUTE CONSTRUED—COUNTY BOUNDARIES.

Act of April 4, 1887 (Mills' Ann. Stats. sec. 771) provides that whenever the boundary lines of any county are so indefinite that by reason thereof territory is claimed by two counties, upon petition of the board of commissioners of either county it shall be the duty of the state engineer, in connection with the county surveyor of each such counties, to run out and establish as nearly as may be, the indefinite boundary, and to fix and define such boundary line by plain and substantial mounds, marks and natural monuments. *Held* that an actual survey and marking of the line upon the ground is intended by the act, and an attempt by the state engineer and county surveyors to fix a disputed county boundary line without going upon the ground and making an actual survey, was unauthorized and their proceedings were without any force or effect whatever.

2. PRACTICE—DISMISSAL.

In an action by one county against another which was created partly from the territory of the former, to determine what proportion of the indebtedness of the old county should be assumed by the new, where there was no evidence as to the value of the taxable property in the territory cut off from the old county, a judgment dismissing the action was proper, although the answer admitted some indebtedness. In the absence of the proof, the only alternative was to dismiss the action or render judgment for defendant; and as the court adopted the course least prejudicial to plaintiff, it has no ground of complaint.

*Appeal from Court of Appeals.*

Mr. ALBERT L. MOSES and Mr. IRA J. BLOOMFIELD, for appellants.

Mr. S. D. CRUMP and Messrs. PATTERSON, RICHARDSON & HAWKINS, for appellee.

MR. JUSTICE GODDARD delivered the opinion of the court.

In 1893 the county of Mineral was formed out of territory theretofore included within Hinsdale, Saguache and Rio Grande counties. Session Laws, 1893, p. 94. Section 8 of the act provides:

" The present indebtedness of Hinsdale, Rio Grande and Saguache counties shall be apportioned between the counties. of Hinsdale, Rio Grande and Saguache and the county of Mineral, in proportion to the ratio which the taxable property of that portion of Hinsdale, Rio Grande and Saguache counties as the same may be, which is now included within the boundaries of Mineral county, bears to the taxable property of Hinsdale, Rio Grande or Saguache county, as the case may be, as shown by the assessment rolls for the year beginning January 1, 1893."

Hinsdale county instituted this action to obtain an apportionment against Mineral county of the amount of its then existing indebtedness, which it claimed the latter county was bound to assume, under the provisions of the foregoing section.

The controversy involves the ascertainment of the area of territory taken by the county of Mineral, that was formerly included within the county of Hinsdale. To settle this dispute it is necessary to determine what line was the true eastern boundary of Hinsdale when Mineral county was created. The contention of plaintiff is that the New Mexico principal meridian extending north from its southern boundary line to the top of the Continental Divide, formed such boundary; that of the defendants is that the New Mexico principal meridian extending from the southern boundary of Hinsdale north to the Rio Grande river, and a line thence westerly along said stream to the 107th meridian of longitude, and thence north along said meridian to a point ten miles north of the 38th parallel of latitude, constitute its eastern boundary.

This question is important because the towns of Upper Creede, South Creede, Jim Town and Bachelor, and several valuable mines, are included within this disputed area.

The act of 1874 creating Hinsdale county, reads as follows:

" The county of Hinsdale shall be bounded as follows: Commencing at the point of intersection of the 9th correction line north with the New Mexico Principal Meridian, and running thence north along the said principal meridian to the southern boundary of Saguache county, thence westerly along the southern boundary of Saguache county to the 107th meridian of longitude west from Greenwich; thence north along said meridian to a point ten miles north of the 38th parallel of north latitude; thence west to a point due north of a point six miles west of the mouth of Lost Trail Creek, on the Rio Grande river; thence south to the point of intersection with the 9th correction line north, thence east along said correction line to the place of beginning."

It will be seen that in order to determine the true eastern boundary of Hinsdale, it is essential to determine whether the Continental Divide or the Rio Grande river was, at the time this act was passed, the southern boundary of Saguache county. To support its theory, the plaintiff below introduced in evidence, and mainly relied upon, a record of certain proceedings had by the Hon. James P. Maxwell, then state engineer, in conjunction with the deputy county surveyor of Rio Grande, and the county surveyors of Hinsdale and Saguache counties, at a meeting held in the town of Creede, on the 16th and 17th of March, 1892, under and in pursuance of an act of the legislature approved April 4, 1887, which provides:

" Sec. 1. That whenever the boundary lines of any county in this state shall be so indefinite that a portion of territory, by reason of such indefinite description, is claimed by two counties, and such fact shall appear by petition of the board of county commissioners of either county to the state engineer, it shall be the duty of such state engineer, in connection with the county surveyor of each such counties, to run out and establish such lines as nearly as may be in accordance with such defective description, and to fix and define such boundary line by plain and substantial mounds and marks, and unmistakable natural monuments, and to furnish the board

of county commissioners of each of said counties with the description of such line as soon thereafter as may be practicable; and when such line shall be so established, it shall be the boundary line between said counties, unless one of said counties shall, within six months from the day of filing the description of said line by the state engineer with the board of county commissioners of such county, commence an action in a court of competent jurisdiction in this state, to determine and settle such disputed line, and prosecute the same with due diligence until its final determination, or shall have settled such disputed line within six months by arbitration, as is now provided by law; Provided, that if the county surveyor of either of such counties, shall not appear and assist the state engineer in making such survey, after due notice so to do, it shall in no manner affect or invalidate such survey, or the boundary lines as they may be fixed by such state engineer. * * * Sec. 3. Nothing in this act shall be so construed as to authorize a change of any county line." Session Laws, 1887, p. 238.

It appears from this record that the meeting was held in pursuance of petitions from the boards of county commissioners of the counties of Saguache, Rio Grande and Hinsdale, asking for a survey and the establishment of the uncertain and indefinite boundary lines between these respective counties; and it being unanimously agreed, by the state engineer and the county surveyors, that an emergency existed requiring an early determination of the question of these boundaries, and that on account of the great depth of snow at that season of the year, it was impracticable to make a survey on the ground, of the various disputed lines, they proceeded to consult the various acts of the legislature that they thought had any bearing upon the subject, and established the boundaries under consideration in accordance with their construction of those acts. They defined and placed the southern boundary of Saguache county, and consequently the northern boundary of Hinsdale county, along the summit of the Continental Divide. The court below rejected these proceed-

ings, and upon testimony introduced, and from an examination and consideration of the statutes which it deemed material to the question involved, determined this issue in favor of the defendants; and the plaintiff failing to introduce any evidence to show the assessed valuation of the property found by the court to have been taken from Hinsdale county by the county of Mineral, the action was dismissed.

On appeal to the court of appeals this judgment was reversed by a divided court, upon the ground that the proceedings had by the state engineer and his assistants were valid, and that their report became the only evidence of the boundary in dispute, and should have been received as conclusive of that question. *Board of Com. of Hinsdale Co. v. Board of Com. of Mineral Co. et al.*, 48 Pac. Rep. 675; 9 Colo. Ct. App. 368.

It will be seen by reference to the opinion that the court of appeals arrived at this conclusion by assuming that the act of 1887 does not require the engineer and his assistants to go upon the ground, and by an actual survey run out and establish the indefinite boundary; and that its requirements are met when, from their own knowledge of the country, and the information they are able to obtain from the statutes, they declare what line, in their opinion, constitutes the true boundary. We do not think that the statute is susceptible of this construction. Its language is plain, and its purport seems to us unmistakable. Whenever the boundary lines of any county are so indefinite that by reason thereof territory is claimed by two counties, upon petition of the board of county commissioners of either county, it makes it the duty of the state engineer, in connection with the county surveyors of each county, to "*run out and establish*" as nearly as may be, the indefinite boundary; "and to *fix and define such boundary line* by plain and substantial mounds and marks, and unmistakable natural monuments."

When used in connection with surveying, the words "*to run out a line*," have a well-defined signification, and mean that a person qualified to do such work shall go upon the

ground, and with proper instruments, chainmen and necessary assistants, establish and mark a line upon the surface of the earth. Giving to these words, therefore, their ordinary meaning, they clearly impose upon these officers the duty of going upon the ground and actually running out the line; and when so run, to mark such line by erecting artificial mounds and placing other physical marks along its course, so that by reference thereto, and to the natural monuments existing on the ground, an accurate description may be furnished the respective counties, that will enable them to identify it as established.

That an actual survey upon the ground was intended is further evidenced by the language of the proviso, which reads as follows:

" That if the county surveyor of either of such counties, shall not appear and *assist the state engineer in making such survey* * * * it shall in no manner affect or invalidate *such survey*, or the boundary lines as they may be fixed by such state engineer."

The survey that the county surveyors are to assist the state engineer in making, cannot by any conceivable rule of construction be held to mean an examination and application of doubtful statutes, or that the assistance to be rendered was in the nature of a judicial inquiry; nor does it contemplate a chamber survey and the running merely of paper lines; but means exactly what it says, a survey as ordinarily and usually understood.

The learned writer of the opinion of the court of appeals concedes that it may become necessary, in order to adjust a boundary line, to run it out on the ground, if by reason of the absence of prominent physical features, it would be necessary to pursue such course in order to make an accurate description; and that in such case, for the want of well-known natural objects, it would be necessary to erect artificial monuments to define it, as the statute directs; but concludes that where the lines have been drawn and unmistakably defined by nature, if a disputed boundary falls upon one of them, its

designation as the true line, naming known points as its termini, and giving its course, is a running out and establishment of it.   Suffice it to say that if the latter conditions exist, then there is no indefinite description, and only under the circumstances first supposed, can the statute be invoked. For the same reason, his illustration is without force, since if defendant's contention was correct, and the Rio Grande river constituted the southern boundary of Saguache county, such a line would not be indefinite, but marked by a natural, permanent line, and therefore no survey would be necessary.

As we construe the statute, the duties imposed upon the state engineer and his assistants are such as, by their profession, they are duly qualified to perform, and contemplate such functions as the legislature would naturally confer upon them; while under the construction adopted by the court of appeals, the power conferred is not only extraordinary and unusual, but of very doubtful validity.   Our conclusion is that the attempt by the state engineer and his assistants to fix by vote the boundary lines in question, was unauthorized, and their proceedings were without any force or effect whatever.

As before stated, the district court disregarded these proceedings, and from an examination of the various statutes that afforded any material aid in ascertaining the true location of the boundary in dispute, supplemented by the testimony of numerous witnesses, found that the east line of Hinsdale, at the time Mineral county was created, began at the intersection of the 9th correction line north and the New Mexico principal meridian, running thence north to the south line of Saguache county, that being the center of the Rio Grande river; thence west along the center line of said river to the 107th meridian, and thence north; thus excluding the most valuable portion of the territory in controversy from the former county of Hinsdale.

It will serve no good purpose for us to notice in detail the various statutes from which the court deduced this finding; but it is sufficient to say that after giving careful attention

to the elaborate and exhaustive arguments advanced by the respective counsel in support of their construction of the various provisions of these acts, we are satisfied that, when read in the light of the testimony introduced, they fully justify and sustain the conclusion of the trial court.

It appears from the supplemental bill of exceptions that the cause was heard before the court and submitted upon briefs thereafter to be filed on behalf of the respective parties; that after the briefs were filed, the court took the case under advisement, and afterwards, and at the February term, 1895, announced its findings and the form of judgment that would be entered; and inasmuch as the proof, on behalf of the plaintiff, as to the indebtedness if any, was so indefinite and uncertain that no judgment could be rendered thereon in behalf of the plaintiff; the judge presiding in open court, announced to counsel for the plaintiff that if it was desired, the court would give the plaintiff an opportunity to offer evidence as to the amount of indebtedness claimed by the plaintiff against the defendants according to the county lines as found by the court; and counsel took until the convening of the court in the afternoon of that day to consider whether such evidence would be offered or not by the plaintiff; but at the incoming of the court in the afternoon, announced that it was not desired on behalf of the plaintiff to offer further evidence; and then stated in open court that the main or pivotal question in the case was the settlement of county lines, and after that had been finally determined, the indebtedness could be adjusted either in this suit or another that might be brought; and thereupon the court rendered judgment dismissing the suit without prejudice.

But, notwithstanding this offer by the court, and its rejection by counsel, it is claimed that since the answer admitted some indebtedness, the court erred in dismissing the action. We think the action of the court was proper. It in no way appearing what the assessed valuation of the taxable property was that the court found had been taken by Mineral from Hinsdale county, it was impossible to ascertain the amount

of indebtedness apportionable against the former; and the only alternative presented, in the absence of such proof, was to dismiss the action or render judgment in favor of defendant. The court having adopted the course least prejudicial to plaintiff, it has no ground of complaint.

A careful examination of the entire record satisfies us that the judgment of the district court should be sustained. The judgment of the court of appeals is therefore reversed, and the cause remanded, with directions to affirm the judgment of the district court.

*Reversed.*

MR. JUSTICE GABBERT not sitting.